## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FEDERATION OF LABOR & CONGRESS OF INDUSTRIAL ORGANIZATIONS<br>815 16th Street, N.W.<br>Washington, D.C. 20006,<br><br>and<br><br>BALTIMORE-DC METRO BUILDING AND CONSTRUCTION TRADES COUNCIL<br>5829 Allentown Road,<br>Camp Springs, Maryland 20746,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL LABOR RELATIONS BOARD<br>1015 Half Street, SE<br>Washington, D.C. 20570-0001,<br><br>Defendant. | Civil Case No. 20-cv-1909 |

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

### INTRODUCTION

1.      Plaintiffs American Federation of Labor and Congress of Industrial Organizations

("AFL-CIO") and the Baltimore-DC Metro Building and Construction Trades Council

("Council") bring this action against the National Labor Relations Board ("NLRB" or "Board")

seeking a declaration that the Board's publication of a final rule in the Federal Register on April

1, 2020, "Representation – Case Procedures:  Election Bars; Proof of Majority Support in

Construction-Industry Collective-Bargaining Relationships," RIN 3142-AA16, 85 Fed. Reg.

18,366 ("Final Rule") violated the Administrative Procedure Act ("APA").    Plaintiffs therefore

request that the Court vacate and set aside the Final Rule, which is set to take effect on July 31, 2020.

## JURISDICTION AND VENUE

2.     Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and the APA, 5 U.S.C. § 702 ("[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof").

3.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (a) the NLRB resides in the District of Columbia; (b) a substantial number of the events giving rise to this claim, including actions taken by the Board in promulgating the Final Rule, occurred in the District of Columbia; and (c) the AFL-CIO has its headquarters and principal office in the District of Columbia and both the AFL-CIO and the Council do business in the District of Columbia.

4.     This Court is authorized to grant declaratory relief under 28 U.S.C. § 2201 (declaratory judgment), and 5 U.S.C. §§ 703 and 706 for violations of the APA.

## PARTIES

5.     Plaintiff AFL-CIO is an unincorporated labor organization consisting of 55 national and international labor organizations representing over 12 million working women and men.

6.     The national union affiliates of the AFL-CIO ("AFL-CIO unions") and their local unions are frequently parties to representation proceedings and elections conducted by the NLRB that will be governed by the Final Rule when it takes effect.

7.     When it takes effect, the Final Rule will make it less likely that the results of elections that AFL-CIO unions are parties to will reflect the uncoerced desires of employees. The Final Rule will have an adverse impact on AFL-CIO unions' ability to obtain and retain the right to

represent employees.  The AFL-CIO unions and their locals would have standing to challenge the Rule in their own right.

8.     A principal purpose of the AFL-CIO is to assist its affiliated unions in promoting the organization of unorganized workers into unions of their own choosing and obtaining for those workers and assisting them to retain the right to bargain collectively with their employers. Article II, section two of the AFL-CIO Constitution provides that one of the objects of the Federation is "[t]o aid and assist affiliated unions in extending the benefits of mutual assistance and collective bargaining to workers and to promote the organization of the unorganized into unions of their own choosing for their mutual aid, protection and advancement."  Article X, section nine(a) of the Constitution further provides that "[t]he Executive Council [of the AFL-CIO – the highest governing body between conventions – ] shall use every possible means to assist affiliated unions in the organization of the unorganized."

9.     The lawsuit is a facial challenge to the Final Rule and does not require the participation of individual AFL-CIO unions.

10.     The AFL-CIO has filed comments concerning every notice of proposed rulemaking issued by the NLRB in the last several decades, including the notice that led to the Final Rule.

11.     The Council is a labor organization composed of 28 local building and construction trades unions in the Maryland, Washington, D.C., and Northern Virginia areas.  Together the Council's affiliated unions represent thousands of skilled construction workers.  One of the objects and principles of the Council is to assist its affiliated local unions in securing improved wages, hours and working conditions through the process of collective bargaining.  The Council and its affiliated local unions secure those improvements through collective bargaining agreements designed to stabilize labor relations in the construction industry, including collective

bargaining agreements entered into under Section 9(a) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 159(a), based on a showing, or offer to show, that a majority of the bargaining unit authorize the union to represent them in collective bargaining.

12.     Defendant NLRB is an independent agency in the executive branch of the federal government.  The NLRB was created and is constituted by the NLRA, 29 U.S.C. § 3(a).

## FACTS

### HOW EMPLOYEES EXERCISE THEIR RIGHT TO REPRESENTATION UNDER THE NLRA

13.     The right to engage in collective bargaining is the central, substantive right created by the NLRA.  Section 7 of the Act vests in employees "the right . . . to bargain collectively through representatives of their own choosing."  29 U.S.C. § 157.

14.     Under Section 9(a) of the NLRA, employees can obtain representation in two ways:  their employer can voluntarily recognize a union when a majority of employees support such representation or employees can petition the NLRB to conduct an election and, if a majority vote in favor of representation, their employer has a legal duty to recognize the union.  In the construction industry, under Section 8(f) of the NLRA, representation can also be obtained by an employer voluntarily recognizing a union without a showing of majority support.

15.     The NLRA requires that the Board maintain strict neutrality in relation to employees' choice of whether or not to be represented.

### Petitions for Elections

16.     Section 9 of the NLRA vests in employees a right to petition the NLRB to conduct an election through which employees can select a representative for purposes of collective bargaining with their employer, change representatives, or demonstrate that they no longer wish to be represented.  29 U.S.C. § 159(c).

17.     Petitions for elections are filed with one of the Board's regional directors who process

petitions, conduct elections, and certify the results, subject to Board review.

18.     If a majority of employees vote in favor of representation in a Board-supervised election,

their employer has a legal duty to recognize and bargain with the chosen representative.

19.     Following a Board-supervised election, a petition for another election cannot be filed by a

rival union, by employees seeking to end union representation, or by the employer for one year.

29 U.S.C. § 159(c)(3).

### The Long-Standing Blocking Charge Policy

20.     The Board has characterized a representation election conducted by the Board as a

"laboratory in which an experiment may be conducted, under conditions as nearly ideal as

possible, to determine the uninhibited desires of the employees."  *General Shoe Corp.*, 77 NLRB

124, 127 (1948).

21.     In order to prevent employees' choice in an election from being tainted by unlawful

conduct, the Board established a policy of suspending the processing of a petition for an election

if (1) a charge is filed by a party to the election proceedings alleging unlawful conduct by a

union or employer that either would taint the election's results or taint the petition itself, (2) the

party to the election requests that the election be blocked and files an adequate offer of proof,

and (3) the Board's Regional Director determines that, if proven, the conduct would "interfere

with employees free choice in an election or would be inherently inconsistent with the petition

itself."  NLRB Casehandling Manual § 11730.

22.     Under the blocking charge policy, the election remains blocked until the charge is

investigated and found not to have merit, the illegal conduct is remedied, or the party that

originally asked for the election to be blocked subsequently requests that the Board proceed with

the election.  NLRB Casehandling Manual §§ 11731-33.

23.     The Board acknowledged in the Notice of Proposed Rulemaking (NPRM) that "the

blocking charge policy dates from shortly after the Act went into effect.  *See United States Coal*

*& Coke Co.*, 3 NLRB 398 (1937)."  84 Fed. Reg. 39,931.

### Employer's Voluntary Recognition of Employees' Chosen Representative

24.     Under Section 9(a) of the NLRA, employers may voluntarily recognize a collective-

bargaining representative when a majority of employees demonstrate that they wish to be

represented by means other than a Board-supervised election, for example, by signing

authorization cards.

25.     Such voluntary recognition is expressly authorized in the NLRA itself which provides

that employees can file a petition for an election alleging "that their employer declines to

recognize their representative."  29 U.S.C. § 9(c)(1)(A)(i).

26.     The Supreme Court has made clear that "a Board election is not the only method by

which an employer may satisfy itself as to the union's majority status [under Section 9(a) of the

Act]." *United Mine Workers* v. *Arkansas Flooring Co.*, 351 U.S. 62, 72 n.8 (1956).

27.     The Supreme Court has held that voluntary recognition under Section 9(a) of the NLRA

is lawful so long as it is based on a majority of employees' support for union representation.

28.     The Board has held that once an employer voluntarily recognizes a union based on

majority support for the union, the parties must be given a reasonable time, no shorter than six

months and no longer than one year, for collective bargaining before a petition for an election

can be filed by a rival union, by employees seeking to end union representation, or by the

employer.  *Lamons Gasket Co.*, 357 NLRB 739 (2011).

**Congressionally-Established Rules Governing the Creation of Collective-Bargaining Relationships in the Construction Industry**

29.     In 1959, Congress amended the NLRA to accommodate conditions peculiar to the construction industry in which skilled workers often work for a series of employers on different construction projects for short periods of time as their particular skills are needed.  In doing so, Congress added Section 8(f) of the Act, 29 U.S.C. §158(f).  Section 8(f) permits unions and employers in the construction industry – but in no other industry – to enter into prehire agreements.  Prehire agreements are collective bargaining agreements that allow the employer and union to establish terms and conditions of employment, including union recognition, wages, benefits, hours, and hiring rules, before any employees are hired.  Congress added Section 8(f) and the ability to enter into prehire agreements in the construction industry because of "the construction industry employer's need to 'know his labor costs before making the estimate upon which his bid will be based' and [because] 'the employer must be able to have available a supply of skilled craftsmen for quick referral.'"  *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 266 (1983) (quoting H.R. Rep. No. 741, 86th Cong., 1st Sess., 19 (1959), 1 *NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959*, p. 777.  A Section 8(f) prehire agreement, therefore, may be entered into in the construction industry before employees are hired and without the union first showing that it has the support of the majority of employees in the bargaining unit.

30.     Section 8(f) creates an exception to Section 9(a) of the NLRA, which requires a union to demonstrate majority support among the employees in the bargaining unit before the union and employer may enter into a collective bargaining agreement.

31.     Collective bargaining relationships in the construction industry are presumed to be entered into under Section 8(f), creating an "8(f) relationship," but like unions and employers in

7

other industries, unions and employers in the construction industry may also enter into a collective bargaining agreement in which recognition of the union is based on it having the support of at least a majority of the bargaining unit.  When doing so, the parties create a "9(a) relationship."

32.     The distinction between a union's representative status under Section 8(f) and under Section 9(a) is significant because a Section 8(f) prehire agreement does not bar a representation petition, but an agreement entered into pursuant to a Section 9(a) relationship bars such a petition during the term of the collective bargaining agreement, or for three years, whichever is less.  In addition, once a Section 8(f) prehire agreement expires, the bargaining relationship may be ended by either party.  By contrast, under Section 9(a), the employer and union are required to continue bargaining even after the agreement expires unless and until the union has lost majority support.

33.     Because collective bargaining relationships in the construction industry are presumed to be Section 8(f) relationships, the Board has adopted a standard through adjudication setting forth what must be proven by parties in the construction industry to establish the existence of a Section 9(a) relationship.  In *Staunton Fuel*, 335 NLRB 717, 719-20 (2001), the Board held that a recognition agreement would be "independently sufficient to establish a union's 9(a) representation status where the [contract] language unequivocally indicates that (1) the union requested recognition as the majority or 9(a) representative of the unit employees; (2) the employer recognized the union as the majority or 9(a) bargaining representative; and (3) the employer's recognition was based on the union's having shown, or having offered to show, evidence of its majority support."

34.     Separate and apart from what employers and unions in the construction industry must prove to establish the existence of a Section 9(a) relationships, the Board has separately addressed when a Section 9(a) relationship in the construction industry can be challenged as not having been based on majority support when it was established.  In *Casale Industries*, 311 NLRB 951, 953 (1993), "the Board held that it would 'not entertain a claim that majority status was lacking at the time of recognition' where 'a construction industry employer extends 9(a) recognition to a union, and 6 months elapse without a charge or petition.'" Final Rule, 85 Fed. Reg. at 18,390-91.  The Board based its holding on the statutory six-month statute of limitations period for the filing of unfair labor practices.  29 U.S.C. § 160(b).

### REGULATORY HISTORY

35.     On August 12, 2019, the NLRB published in the Federal Register a Notice of Proposed Rulemaking, "Representation – Case Procedures:  Election Bars; Proof of Majority Support in Construction-Industry Collective-Bargaining Relationships," RIN 3142-AA16, 84 Fed. Reg. 39,930.

36.     The NPRM proposed changes to the Board's blocking charge policy, its rules governing voluntary recognition, and its standard for assessing whether an existing collective-bargaining relationship in the construction industry bars an election petition.

### Regulatory History of Amendment to Blocking Charge Policy

37.     The Board proposed to replace the blocking charge policy with a "vote-and-impound procedure," where Regional Directors would process representation petitions and conduct elections in all cases, despite the pendency of unfair labor practices that would be the basis for blocking the election under the current policy.  However, instead of tallying the ballots at the conclusion of the election, the ballots would be impounded.

38.     The rule proposed in the NPRM provided:

> Whenever any party to a representation proceeding files an unfair labor practice charge together with a request that it block the election process, . . . . [t]he regional director shall continue to process the petition and conduct the election. If the charge has not been withdrawn, dismissed, or settled prior to the conclusion of the election, the ballots shall be impounded until there is a final determination regarding the charge and its effect, if any, on the election petition or fairness of the election.

84 Fed. Reg. at 39,957 (proposed § 103.20).

39.     The NPRM did not state or suggest in any manner that the Board was considering any other changes in the blocking charge policy or any regulatory approach other than conducting the election, but impounding the ballots.  In fact, the Board stated that, "[h]aving preliminarily reviewed numerous suggestions for revision or elimination of this policy," it proposed to adopt the vote-and-impound procedure because that procedure, in the Board's view, "best satisfies the goal of protecting employee free choice." 84 Fed. Reg. at 39,938.  The Board did not describe any of the "numerous [alternate] suggestions" other than the one proposed in the NPRM.

40.     The Board explained in the NPRM that the proposed rule was justified by (1) the undue delay caused by blocking charges and (2) the loss of "momentum" suffered by the party petitioning for the election during the delay.

41.     In support of that express rationale for the proposed rule, the Board made factual statements about and presented extensive data concerning blocking charges under the existing policy.

42.     The Board attached a 143-page appendix to the NPRM purporting to present data from cases involving blocking charges between Fiscal Years 2016 and 2019.

43.     The factual statements in the NPRM and the data contained in the appendix to the NPRM contained gross errors.

44.　　In some cases, the errors were apparent on the face of the data.

45.　　Dissenting Board Member Lauren McFerran pointed out some of the errors in her dissent to the NPRM, but also stated that she "did not have sufficient time prior to the publication of this NPRM to review" all the data needed to identify all errors in the majority's presentation.  84 Fed. Reg. 39,947 n. 74 (Member McFerran dissenting).

46.　　Despite some of the errors being apparent on the face of the data and despite the fact that the dissenting Board Member pointed out some of the errors, the Board did not correct the errors before publishing the NPRM.

47.　　Subsequent to the publication of the NPRM, the press reported on the errors, citing administrative law experts who stated that the Board should correct the errors in a supplemental notice.

48.　　Several parties, including the AFL-CIO and several of its affiliated national unions, filed comments using data supplied by the Board itself pursuant to a Freedom of Information Act request to demonstrate that there were many additional errors in the NPRM.

49.　　The Board did not issue any form of supplemental notice correcting the errors.

50.　　In the preamble to the Final Rule, the Board acknowledged claims that there were errors in the Board's data, but did not admit that any errors existed or correct the errors.  The Board stated:

> We also acknowledge the claims in the dissent to the NPRM and by some commenters that there were errors in some of the data that the NPRM majority cited to support the proposed rule and that these errors led to exaggeration both of the number of cases delayed and the length of delay involved. Even accepting those claims as accurate, the remaining undisputed statistics substantiate the continuing existence of a systemic delay that supports our policy choice to modify the current blocking-charge procedure.

85 Fed. Reg. 18,377.

51.     The Board did not describe or identify in any way "the remaining undisputed

statistics."

52.     The Final Rule's revision of the blocking charge policy differed significantly from the

proposed rule.  Having proposed the vote-and-impound procedure in the NPRM, the Board in the

Final Rule instead adopted "a vote-and-count procedure for most categories of charges, and a

vote-and-impound procedure for some limited categories of charges[.]" 85 Fed. Reg. 18,380.

53.     The Final Rule provided:

> (a)     Whenever any party to a representation proceeding files an unfair
> labor practice charge together with a request that the charge block the election
> process. . . .
>
> (b)  If charges are filed alleging violations other than those described in
> paragraph (c) of this section, the ballots will be promptly opened and counted at
> the conclusion of the election.
>
> (c)  If charges are filed that allege violations of section 8(a)(1) and 8(a)(2)
> or section 8(b)(1)(A) of the Act and that challenge the circumstances
> surrounding the petition or the showing of interest submitted in support of the
> petition, or a charge is filed that alleges an employer has dominated a union in
> violation of section 8(a)(2) and seeks to disestablish a bargaining relationship,
> the regional director shall impound the ballots for up to 60 days from the
> conclusion of the election if the charge has not been withdrawn or dismissed
> prior to the conclusion of the election. If a complaint issues with respect to the
> charge at any point prior to expiration of that 60-day post-election period, then
> the ballots shall continue to be impounded until there is a final determination
> regarding the charge and its effect, if any, on the election petition. If the charge is
> withdrawn or dismissed at any time during that 60-day period, or if the 60-day
> period ends without a complaint issuing, then the ballots shall
> be promptly opened and counted. The 60-day period will not be extended,
> even if more than one unfair labor practice charge is filed serially.
>
> (d) For all charges described in paragraphs (b) or (c) of this section, the
> certification of results (including, where appropriate, a certification of
> representative) shall not issue until there is a final disposition of the charge
> and a determination of its effect, if any, on the election petition.

85 Fed. Reg. at 18,399 (new § 103.20).

54.     The proposed rule would have altered the blocking charge policy by permitting elections to proceed despite the pendency of unfair labor practice charges that would have blocked the election under the existing policy, but requiring the impounding of the ballots. The Final Rule, in contrast, permits the election *and* the counting of the ballots to proceed in almost all cases, while drastically limiting the category of cases that can lead to impoundment of the ballots.

55.     The Board did not provide any rationale for its classification of charges into the category than can lead to impoundment of ballots and the category that cannot lead to impoundment of ballots.

**Regulatory History of Change to Rules Governing Voluntary Recognition**

56.     In the NPRM, the Board proposed that a collective bargaining relationship created by an employer's voluntary recognition of a union based on a showing of majority support among the employees would not be entitled to insulation from challenge for a reasonable period of time unless the employer posted a notice informing employees that they could file a petition for an election during a window period of 45 days and either (1) no such petition was filed during the window period or (2) a petition was filed and employees voted in favor of continued representation in the subsequent election.

57.     In its comments on the NPRM, the AFL-CIO pointed out that, together with existing notice requirements and standing alone, the proposed notice was inconsistent with the statutory requirement that the Board remain strictly neutral on the question of whether employees should support or oppose representation.

58.     The AFL-CIO comments pointed out that if the proposed rule was adopted, setting aside the neutral notices informing employees (a) that a petition has been filed and

that an election will be held and (b) that an employer or union has committed an unfair labor practice and will cease and desist the unlawful conduct, the Board would require that notice be given to employees of only two of their many rights under the NLRA:  a pre-existing notice requirement informing employees of the right not to join a union and to object to paying full union dues, and the newly required notice informing employees of the right to file a petition to decertify a recently and lawfully recognized union.

59.     The AFL-CIO's comments pointed out that that the Board does not require notice to employees of their right to change their minds about the exercise of their rights in any other context.  The comments further pointed out that this is true even in the mirror image situation when a majority of employees have registered their desire not to be represented by non-electoral means and their employer has voluntarily recognized their wishes by withdrawing recognition from the union.  When an employer lawfully withdraws recognition based on a petition or other non-electoral showing of lack of majority support, the Board does not require the employer to post a notice informing employees that they can file a petition for an election in order to regain representation.

60.     The AFL-CIO comments stated that the proposed rule would be inconsistent with the Board's statutory duty to remain strictly neutral in relation to employees' choice whether or not to be represented.

61.     The preamble to the Final Rule did not address that significant point in the AFL-CIO's comments.

### Regulatory History of Change to Standard of Proof of 9(a) Relationships in the Construction Industry

62.     Less than one year prior to issuing the NPRM, the Board announced its intent to revisit its *Staunton Fuel* decision and the standard for proving the existence of a Section 9(a)

14

relationship in the construction industry, and the separate question of when a construction industry union's majority status as a Section 9(a) representative may be challenged. On September 11, 2018, the Board invited interested *amici* to file briefs in the *Loshaw Thermal Technology* case, 5-CA-158650. In doing so, the Board invited briefing on three questions: (a) "Should the Board adhere to, modify, or overrule *Staunton Fuel*?"; (b) "If the Board were to overrule *Staunton Fuel*, what standard should the Board adopt in its stead?"; and lastly and separately (c) "Even if the Board modifies or overrules *Staunton Fuel*, under *Casale Industries* contract language alone would continue to be sufficient to establish 9(a) status whenever that status goes unchallenged for 6 months after 9(a) recognition is granted. If *Staunton Fuel* is modified or overruled, should the Board adhere to, modify, or overrule *Casale Industries*, and, if either of the latter, how?" The "request for briefing was suspended and ultimately rescinded after the charging party union withdrew the underlying unfair labor practice charge." 84 Fed. Reg. at 39939, n. 50.

63.     In the NPRM, "[t]he Board propose[d] to overrule *Staunton Fuel*" and add a new section to the Board's rules stating that, "contract language alone cannot create a 9(a) bargaining relationship in the construction industry," and that "incorporate[s] the requirement of extrinsic proof of contemporaneous majority support." 84 Fed. Reg. at 39,938. The proposed rule stated:

> A voluntary recognition or collective-bargaining agreement between an employer primarily engaged in the building and construction industry and a labor organization will not bar any election petition filed pursuant to Section 9(c) or 9(e) of the Act absent positive evidence that the union unequivocally demanded recognition as the Section 9(a) exclusive bargaining representative of employees in an appropriate bargaining unit, and that the employer unequivocally accepted it as such, based on a contemporaneous showing of support from a majority of employees in an appropriate unit. Contract language, standing alone, will not be sufficient to prove the showing of majority support.

64.     Unlike the Board's invitation for briefing in the *Loshaw Thermal Technology* case, the

Board's NPRM did not propose to overrule *Casale Industries*.  Indeed, that case is not even

mentioned in the NPRM, nor is the issue of when a party must bring a challenge to an alleged

Section 9(a) relationship in the construction industry discussed.

65.     In the Final Rule, the Board added a section to the proposed rule, which states that it

applies to "any collective bargaining agreement entered into on or after the date of voluntary

recognition extended on or after the effective date of this rule."  The Board explained that not

only was it overruling *Staunton Fuel*, but that, even though the issue was not addressed in the

NPRM, "we decline to adopt a Section 10(b) 6-month limitation on challenging a construction-

industry union's majority status," and that therefore, "we overrule *Casale* in relevant part and

will evaluate a construction-industry union's purported 9(a) recognition at any time that an

election petition is filed."  85 Fed. Reg. at 18,391.

## The Board's Rulemaking Authority

66.     The NLRB has authority to adopt rules, "in the manner prescribed by subchapter II of

chapter 5 of title 5 [the APA]," under 29 U.S.C. § 156.

67.     The NLRB's rulemaking, including the promulgation of the Final Rule, is subject to the

requirements of the APA.

## COUNT ONE

**THE BOARD'S PUBLICATION OF FALSE FACTUAL STATEMENTS AND GROSSLY INACCURATE DATA CONCERNING THE EXISTING BLOCKING CHARGE POLICY IN THE NPRM AND FAILURE TO CORRECT THOSE ERRORS AT ANY TIME DEPRIVED INTERESTED PARTIES OF FAIR NOTICE IN VIOLATION OF THE APA**

68.     The allegations in paragraphs 1-67 are incorporated here.

69.     By making false factual statements and presenting grossly inaccurate data concerning the existing blocking charge policy in the NPRM and not correcting those errors at any time, the Board failed to provide adequate notice in violation of the APA and to follow procedure required by law under 5 U.S.C. § 706(2)(D).

## COUNT TWO

### THE BOARD'S PUBLICATION OF FALSE FACTUAL STATEMENTS AND GROSSLY INACCURATE DATA CONCERNING THE EXISTING BLOCKING CHARGE POLICY IN THE NPRM AND FAILURE TO CORRECT THOSE ERRORS AT ANY TIME WAS ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION IN VIOLATION OF THE APA

70.     The allegations in paragraphs 1-67 are incorporated here.

71.     The Board's publication of false factual statements and grossly erroneous data concerning the existing blocking charge policy in the NPRM and failure to correct those errors at any time was arbitrary, capricious and an abuse of discretion in violation of the APA.  5 U.S.C. § 706(2)(A).

## COUNT THREE

### THE BOARD'S FAILURE TO RESPOND TO THE AFL-CIO'S COMMENT CONCERNING THE COMPOSITION OF CASES IN WHICH BLOCKING CHARGES ARE FILED VIOLATED THE APA'S NOTICE AND COMMENT REQUIREMENT

72.     The allegations in paragraphs 1-67 are incorporated here.

73.     In its comment on the proposed rule, Plaintiff AFL-CIO pointed out that the Board's factual statement that blocking charges are "almost invariably [filed by] a union and most often in response to an RD petition" seeking an election to decertify the union, 84 Fed. Reg. 39,931, was false.

74.    Plaintiff AFL-CIO supported the statement in its comment with an analysis of the

Board's own data produced pursuant to a Freedom of Information Act request. The analysis was

conducted by one of the foremost academic experts on NLRB procedures.

75.    The analysis of the Board's own data demonstrated that the vast majority of blocking

charged are filed by petitioners and are not filed in RD cases.

76.    In its comment on the proposed rule, Plaintiff AFL-CIO pointed out that the only

rationale offered by the Board for amending the blocking charge policy – that the delay caused

by blocking charges deprives petitioning parties of "momentum" – does not apply to the

overwhelming majority of cases in which blocking charges are filed because they are filed by the

petitioner and the petitioner has the right at any time to request that the election proceed despite

then pendency of the charge or charges.

77.    The Board failed to respond to these comments in the preamble to the Final Rule or in

any other manner.

78.    By failing to respond to significant comments, the Board failed to follow the notice and

comment procedure mandated by the APA and to follow procedure required by law. 5 U.S.C. §

706(2)(D).

## COUNT FOUR

**THE BOARD'S PROMULGATION OF A FINAL RULE CONTAINING AN
AMENDMENT TO THE BLOCKING CHARGE POLICY THAT DIFFERS
SIGNIFICANTLY FROM THE PROPOSAL IN THE NPRM DEPRIVED INTERESTED
PARTIES OF ADEQUATE NOTICE IN VIOLATION OF THE APA**

79.    The allegations in paragraphs 1-67 are incorporated here.

80.    By publishing a Final Rule amending the blocking charge policy in a manner that differed

significantly from the amendment described in the NPRM, the Board failed to provide adequate

notice in violation of the APA and to follow procedure required by law. 5 U.S.C. § 706(2)(D).

## COUNT FIVE

**THE BOARD'S FAILURE TO PROVIDE ANY RATIONALE FOR WHERE IT DREW THE LINE BETWEEN THE CATEGORY OF UNFAIR LABOR PRACTICE CHARGES THAT MAY LEAD TO IMPOUNDMENT OF BALLOTS AND THE CATEGORY OF CHARGES THAT MAY NOT LEAD TO IMPOUNDMENT OF BALLOTS VIOLATED THE APA'S NOTICE AND COMMENT REQUIREMENT AND WAS ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION**

81.     The allegations in paragraphs 1-67 are incorporated here.

82.     By failing to provide any rationale for where it drew the line between the category of unfair labor practice charges that may lead to impoundment of ballots under the Final Rule and the category of unfair labor practice charges that may not lead to impoundment of ballots under the Final Rule, the Board violated the APA's notice and comment requirement, failed to provide a "a concise general statement of the[ Final Rule's] basis and purpose" under 5 U.S.C. §553(c), and acted in a manner that was arbitrary, capricious and an abuse of discretion in violation of the APA. 5 U.S.C. §§ 702(2)(A) and 706(2)(D).

## COUNT SIX

**THE BOARD'S FAILURE TO RESPOND TO THE AFL-CIO'S COMMENT THAT THE PROPOSED NOTICE REQUIREMENT WOULD BE INCONSISTENT WITH THE BOARD'S STATUTORY DUTY TO REMAIN STRICTLY NEUTRAL IN RELATION TO EMPLOYEES' CHOICE CONCERNING REPRESENTATION VIOLATED THE APA'S NOTICE AND COMMENT REQUIREMENT**

83.     The allegations in paragraphs 1-67 are incorporated here.

84.     By not responding to the AFL-CIO's comment that the proposed notice requirement would be inconsistent with the Board's statutory duty to remain strictly neutral in relation to employees' choice concerning representation, the Board failed to follow the notice and comment procedure mandated by the APA and to follow the procedure required by law. 5 U.S.C. § 706(2)(D).

## COUNT SEVEN

### THE FINAL RULE'S NOTICE REQUIREMENT IS INCONSISTENT WITH THE BOARD'S STATUTORY DUTY TO REMAIN STRICTLY NEUTRAL IN RELATION TO EMPLOYEES' CHOICE CONCERNING REPRESENTATION

85.     The allegations in paragraphs 1-67 are incorporated here.

86.     By requiring that notice be provided to employees only after they exercise their right to be represented and by requiring that the notice inform employees of their right not to be represented, the Board violated its statutory duty to maintain strict neutrality in relation to employees' choice to be represented or not to be represented and acted not in accordance with law, 5 U.S.C. § 706(2)(A), and in excess of statutory jurisdiction, authority, or limitations, and short of statutory right, 5 U.S.C. § 706(2)(C), all in violation of the APA.

## COUNT EIGHT

### THE BOARD'S PROMULGATION OF A FINAL RULE ON CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING RELATIONSHIPS THAT DIFFERS SIGNIFICANTLY FROM THE PROPOSAL IN THE NPRM VIOLATED THE APA

87.     The allegations in paragraphs 1-67 are incorporated here.

88.     By publishing the Final Rule on construction industry collective bargaining agreements, and overruling *Casale*, without proposing such a change in the NPRM, the Board failed to provide adequate notice in violation of the APA and to follow procedure required by law.  5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that this Court enter judgment in their favor and

1.      Declare that the NLRB's promulgation of the Final Rule violated the APA's notice and

comment requirements, that the NLRB's promulgation of the Rule was arbitrary, capricious and

an abuse of discretion in violation of the APA, and that the NLRB's promulgation of the Rule

was inconsistent with the NLRA in violation of the APA.

2.      Vacate and set aside the Final Rule.

3.      Award Plaintiffs costs, including reasonable attorney's fees.

4.      Grant such other relief as is just and proper.


Respectfully submitted,


/s/ Lucas R. Aubrey
Jonathan D. Newman (D.C. Bar No. 449141)
Lucas R. Aubrey (D.C. Bar No. 982849)
Bartholomew J. Sheard (D.C. Bar No. 1542094)
   (*application for admission pending*)
Sherman Dunn, P.C.
900 Seventh Street, N.W., Suite 1000
Washington, D.C. 20001
aubrey@shermandunn.com
202-785-9300

/s/ Harold Craig Becker
Harold Craig Becker (D.C. Bar No. 371239)
James B. Coppess (D.C. Bar No. 347427)
Matthew J. Ginsburg (D.C. Bar No. 1001159)
Maneesh Sharma (D.C. Bar No. 1033407)
AFL-CIO Legal Department
815 16th Street, N.W.
Washington, D.C. 20006
202-637-5310
cbecker@aflcio.org


Dated:  July 15, 2020