**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR & CONGRESS OF INDUSTRIAL ORGANIZATIONS | ) ) ) |
| and | ) ) |
| BALTIMORE-DC METRO BUILDING AND CONSTRUCTION TRADES COUNCIL, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| NATIONAL LABOR RELATIONS BOARD, | ) ) |
| Defendant. | ) ) |

Civil Case No. 20-cv-1909-BAH

## NATIONAL LABOR RELATIONS BOARD'S REPLY IN SUPPORT OF MOTION FOR TRANSFER TO THE D.C. CIRCUIT TO CURE WANT OF JURISDICTION

The issue presented by this motion is not easy, but it *is* simple: is the National Labor Relations Act ("NLRA" or "the Act")'s provision channeling jurisdiction of judicial review to the circuit courts, specifically Section 10(f) of the NLRA 29 U.S.C. § 160(f), broad enough to encompass rulemakings initiated by the National Labor Relations Board? The answer is yes. Clear precedent from the D.C. Circuit and Supreme Court commands that ambiguous statutes providing for direct review of agency actions in circuit courts be read as broadly as their text will permit. Section 10(f)'s relatively broad language can be read, even in light of some ambiguities created by its venue provisions and placement within the NLRA, to authorize circuit courts to review this matter. This is especially so when Section 10(f) is placed in the context of the whole NLRA—a statute animated by a manifest Congressional intent to remove district courts from the practice of issuing sweeping pronouncements governing national labor policy. Because the NLRA can be given such a broad reading, under the precedents we have cited, it must be.

1

I.     **AFL-CIO cannot foreclose by estoppel reexamination of this Court's subject-matter jurisdiction.**

There is no question that the issue of jurisdiction to review NLRA rulemakings was accorded insufficient attention—and indeed, for the most part, *no attention at all*—in cases prior to this Court's very recent decision in *AFL-CIO v. NLRB*, No. 20-0899, 2020 WL 3041384 (D.D.C. June 7, 2020) ("*AFL-CIO I*"). AFL-CIO does not contend otherwise (Opp. at 9 n.2.). But "the existence of unaddressed jurisdictional defects" in a prior decision "has no precedential effect." *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) (citing *Fed. Election Comm'n* v. *NRA Political Victory Fund,* 513 U.S. 88, 97 (1994); *United States* v. *More,* 7 U.S. (3 Cranch) 159, 172 (1805) (Marshall, C. J.) (bench decision)). The question of jurisdiction is too essential to be decided by "drive-by jurisdictional holdings." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

Thus, "[o]bjections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). In other words, a plaintiff cannot enlarge a federal court's subject-matter jurisdiction by reference to "principles of estoppel." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Accordingly, as an initial matter, AFL-CIO's various efforts (Opp. at 2, 7-10) to show that the Board's position is inconsistent with prior positions that it has taken are irrelevant and miss the mark. This case must be decided by analysis of the statutory text alone.

II.    **Section 10(f) of the NLRA, on its face, grants direct circuit-court review jurisdiction over all final orders of the Board.**

We now turn to a more detailed analysis of Section 10(f) and the NLRA as a whole. On that point, AFL-CIO gains no purchase from the undisputed observation (Opp. at 2) that "the normal default rule is that persons seeking review of agency action go first to district court rather

than to a court of appeals." *Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270 (D.C. Cir. 2012) (cleaned up). That default rule simply does not apply where the statute in question contains a direct-review provision like Section 10(f); in such cases, the applicable default rule is to read the direct-review provision to encompass review of all types of agency action. *Id.* This broad reading of direct review provisions avoids the irrationality of splitting judicial review between different levels of the court system unless there is a "firm indication" that Congress intended such a split. *Id.*[1] In other words, as we previously explained (Mot. at 6), any ambiguity in the direct-review provision will be read in favor of coverage.

Of course, when a direct-review provision extends only to rules made pursuant to a particular statutory authority, it cannot be interpreted to extend to rules made under *another* statutory authority—else the limitations Congress placed upon direct review would be disregarded. *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 626 (2018) (*NAM*). This rule has been repeatedly applied by the D.C. Circuit, notably in *Loan Syndications & Trading Ass'n v. SEC*, 818 F.3d 716, 719 (D.C. Cir. 2016), upon which AFL-CIO relies in resisting the Board's motion. In that case, the Exchange Act provided for direct review of rules issued "pursuant to section 78f, 78i(h)(2), 78k, 78k-1, 78o(c)(5) or (6), 78o-3, 78q, 78q-1, or 78s" of that Act, but the rule in question was issued under Section 78o-11 of the same Act. *Id.* at 720. Transparently, then, direct review of that rule could not be had without effectively blue-penciling "Section 78o-11" into the list of authorities subject to direct review.

---

[1] Accordingly, AFL-CIO's citation (Opp. at 2) to *Rodriguez v. Penrod*, 857 F.3d 902, 906 (D.C. Cir. 2017), is simply inapposite—in that case, "nothing in Section 1034(h) or any other provision of the Whistleblower Act provide[d] for direct review in the courts of appeals." *Id. Rodriguez* illustrates that a court cannot simply invent direct appellate review out of whole cloth, but that is, of course, not the situation we face here.

This case presents no such problems. On its face, the first clause of Section 10(f) of the NLRA, 29 U.S.C. § 160(f), encompasses the instant rulemaking. That Section provides in relevant part that:

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside.

The jurisdictional trigger here, then, is "a final order of the Board" that grants or denies some form of "relief sought." And the Final Rule at issue in this case meets each of these criteria. Is it "final"? Certainly—it is the culmination of the Board's decision-making process, and legal consequences flow from it. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Is it an "order"? Again, yes—for purposes of direct-review statutes, rulemakings are a form of "order" subject to circuit-court review. *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1130-34 (D.C. Cir. 2015) (*NYRSC*). Does it grant or deny relief? AFL-CIO disputes this, but as we explain in the next section, the Final Rule can and should be understood as a type of relief.

What's more, unlike the statutes in *NAM*, 138 S. Ct. at 626, and *Loan Syndications*, 818 F.3d at 719, the NLRA does not limit circuit court review to any particular class or category of "final orders of the Board granting or denying . . . relief sought." To be sure, as both parties have (we hope) made clear to the court, Board orders in *individual representation cases* are not judicially reviewable under Section 10(f), or indeed at all, but the reason for this is that Congress, when it enacted the NLRA, deemed those orders not to be final.[2] On its face, the text

---

[2] By express Congressional design, certifications may be the subject of collateral attacks in unfair labor practice cases thanks to the provisions of Section 9(d) of the Act, 29 U.S.C. § 159(d), which makes the record of a representation certification part of the record on review of any unfair labor practice case arising out of that certification. Congress's characterization of

of Section 10(f) broadly encompasses reviewable agency action under the Administrative

Procedure Act ("APA"). *See* 5 U.S.C. § 551(13) (defining the scope of reviewable agency action

under the APA).

### III.    The Board granted "relief" within the meaning of the Administrative Procedure Act when it issued the Final Rule.

As just noted, AFL-CIO disputes that the Board in this case has granted any "relief

sought" (Opp. at 6, 15-16). A rulemaking, it suggests, is not "an agency action that grants or

denies any relief to a regulated party." (Opp. at 15, citing *AFL-CIO I*, 2020 WL 3041384, at \*10;

*see also* Opp. at 16 n.4 ("Even if the Board could seek relief from itself, the Board never took

any action that could be characterized as such and the Final Rule did not do anything that can be

characterized as granting relief as those words are ordinarily understood.").) The NLRB

disagrees. "Relief" under the APA, as under common usage both prior to and since the NLRA's

passage, is a term of surpassing breadth, including "the whole or a part of an agency—(A) grant

of money, assistance, license, authority, exemption, exception, privilege, or remedy; (B)

recognition of a claim, right, immunity, privilege, exemption, or exception; or (C) taking of other

action on the application or petition of, and beneficial to, a person[.]" 5 U.S.C. § 551(11).[3]

*Accord Relief*, NEW WEBSTERIAN 1912 DICTIONARY ILLUSTRATED 690 (1912) (*inter alia*,

"release from some post of duty" or "redress"); *Relief*, OXFORD ENGLISH DICTIONARY (3RD ED.

2009) (*inter alia*, "formal release, esp. in law, from some hardship, burden, or grievance" or

"legal remedy or redress").

---

representation cases as non-final thus binds both this Court and the parties. *Am. Fed. of Labor v. NLRB*, 308 U.S. 401, 409 (1940) ("*AFL*").

[3] Commentators immediately understood the breadth of the APA's definition of "relief," and that expanding judicial review to all forms of "relief" would have the effect of significantly broadening the extent to which such review was available. *See* Bernard Schwartz, *Administrative Terminology and the Administrative Procedure Act*, 48 MICH. L. REV. 57, 75 (1949).

AFL-CIO's error is to treat the APA definition as though it were restricted to the C prong—covering only direct petitions to an agency. From the facts recited in the NPRM and Final Rule and our opening brief (Mot. at 9-10), it should be clear that the Board has granted any number of "privileges, exemptions, or exceptions" from its prior rules, recognized "rights" that did not previously exist, and generally given parties more responsibilities in some areas, and fewer responsibilities in others, than under the Board's prior regulations.[4] Accordingly, the Final Rule fits within prongs A and B of the APA's definition.  Moreover, when Congress says that a definition "includes" some category, it necessarily authorizes courts to expand upon that category. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) ("[T]he definition is introduced with the verb 'includes' instead of 'means.' This word choice is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive.") (citation omitted). Even if the Final Rule did not fit the express terms of the APA's definition, it would be close enough to the types of "relief" defined there to warrant inclusion.

The Board therefore sought relief by issuing a notice of proposed rulemaking—a formal action which initiated a legal proceeding and gave general notice and an opportunity to present facts and argument to be made part of an administrative record—and it granted relief within the broad meaning of that term in administrative law when it issued the final rule at bar. Contrary to

---

[4] There are a plethora of examples: parties must prepare and campaign for elections in circumstances where unfair labor practice allegations are pending and would previously have blocked elections, *see* 84 Fed. Reg. 39,937-38; 29 C.F.R. § 103.20(b), (c) (2020); parties must bargain while challenges to an employer's voluntary recognition of a union are pending, *see* 85 Fed. Reg. 18,368; parties are *exempt* from mandated bargaining where such a challenge has been sustained, *see id.*; and parties must exchange significantly different and more detailed evidence prior to effectuating voluntary recognition in the construction industry in order to bar challenges to the union's certification, *see* 84 Fed. Reg. 39,938-39; 29 C.F.R. § 103.22(a) (2020).

AFL-CIO's assertion, there is nothing linguistically unnatural about the notion of granting administrative "relief" through rulemaking as opposed to adjudication.

AFL-CIO's counterargument thus reduces to the claim that because the Board, in this particular case, happened to act on its own motion, the requirements of Section 10(f) are not met. But this is mere happenstance that cannot be permitted to control the locus of judicial review. The Board can make rules at the behest of a private party's petition for rulemaking and has, in recent years, done just that. *Notification of Employee Rights Under the National Labor Relations Act*, 76 Fed. Reg. 54,005 (Aug. 30, 2011). At any time, AFL-CIO could petition the Board to reverse this rulemaking. 29 C.F.R. § 102.124.[5] If AFL-CIO were to do so, the Board would presumably decline the invitation, for the same reason that it issued the Rule in the first place. AFL-CIO would then have been denied relief, and by its own reasoning here, be entitled to circuit-court review; it could thus, by either filing or declining to file a rulemaking petition, control the locus of review. Subject-matter jurisdiction cannot hinge on such tactical calculations. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 742 (1985) (rejecting construction of statute that would have made the locus of judicial review dependent upon the "fortuitous circumstance" of whether an interested person happened to request a hearing or not).[6]

---

[5] This possibility is no mere hypothetical; as to another recent rulemaking conducted by the Board, regarding joint employment under the NLRA, AFL-CIO actually filed just such a petition, which is currently pending. **Exhibit 1**, attached.

[6] AFL-CIO poses its own slippery-slope hypothetical—couldn't the Board theoretically file its own unfair labor practice charge and grant relief upon it? (Opp. at 16.) We see no reason to fight this hypothetical; in our view, the circuit courts, not the district courts, would indeed have subject-matter jurisdiction to review such an order. But no absurd result follows. The order would be summarily vacated for precisely the reason AFL-CIO cites: the Board has no authority to initiate unfair labor practice prosecutions analogous to the way that it may initiate rulemakings. *Chamber of Commerce of U.S. v. NLRB*, 856 F. Supp. 2d 778, 791 (D.S.C. 2012), *aff'd*, 721 F.3d 152 (4th Cir. 2013). AFL-CIO has confused the question of subject-matter jurisdiction, i.e. the allocation of different classes of cases to different levels of the judiciary,

When the Board initiates and then concludes a rulemaking proceeding by making regulations with prospective binding effect, that's "granting . . . relief sought" within the meaning of Section 10(f).

## IV.   Even assuming Section 10(f) applies only when unfair labor practices are at issue, this rulemaking is one of those cases.

With these preliminaries addressed, the crux of the argument advanced by AFL-CIO is that Section 10(f) permits review only "when some kind of unfair labor practice is at issue" (Opp. at 10, citing *AFL-CIO I* at *9). But unfair labor practices *are* at issue here, because the instant Rule will significantly impact how those cases are litigated and whether certain conduct can be found to be unfair labor practices. This case thus presents the scenario distinguished by footnote 9 of *AFL-CIO I*, at *12: a Board rule that pertains to unfair labor practices.

AFL-CIO resists this conclusion by handwaving away the entire preamble to the Rule as "speculation" and "stray remarks," and insisting that the amendments to the Board's rules and regulations are "directed at the processing of representation petitions." (Opp. at 13.)[7] But it obscures the actual text of those rules in doing so. The new blocking-charge policy explicitly restricts the operative effect of filed unfair labor practice charges upon concurrent representation

---

with the question of whether an agency has overstepped its statutory authority. The latter, as the Supreme Court has recently taken pains to clarify, is not a jurisdictional question at all, but one running to the merits of the agency action. *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013) ("Because the question—whether framed as an incorrect application of agency authority or an assertion of authority not conferred—is always whether the agency has gone beyond what Congress has permitted it to do, there is no principled basis for carving out some arbitrary subset of such claims as 'jurisdictional.'"). Because jurisdiction and power to act are two different things, merely observing that circuit courts would have jurisdiction to review a species of *ultra vires* Board action in no way implies that such action would actually be lawful.

[7] While we express no views on the validity of "stray remarks" as a doctrine in other contexts, such a doctrine cannot apply to the considered, published views of an agency justifying its reasons for engaging in a rulemaking. *Cf. Citizens Awareness Network v. U.S.*, 391 F.3d 338, 360 (1st Cir. 2004) (Lipez, J., concurring) (rejecting petitioner's attempt to characterize provisions of the preamble to a rule as mere "stray remarks" not expressing the agency's real views).

proceedings.[8] Even setting aside the fact that we are talking about the blocking *charge* policy

here, i.e. a policy specifically focused upon the effect of unfair labor practice charges, variations

of the word "charge" are used ten times in the new provisions of the Rule. Unfair labor practice

cases are at the heart of the blocking-charge policy change.

The argument for why the new voluntary-recognition bar policy impacts unfair labor

practices is concededly more complex, because new 29 C.F.R. § 103.21, unlike Section 103.20,

does not directly reference unfair labor practice cases. But, for the reasons explained in our

opening brief (Mot. at 10) and the preamble to the Rule, 85 Fed. Reg. at 18,384-85, the Board's

rule changes will both expand unfair labor practice liability in some cases and rule it out in

others, depending on the situation at hand. This is not some speculative, attenuated consequence

of the Rule; it's a deliberate choice that the Board wrestled with in deciding whether to

---

[8] The Rule added the following language to 29 C.F.R. § 103.20:

(b) If [unfair labor practice] charges are filed alleging violations other than those described in paragraph (c) of this section, the ballots will be promptly opened and counted at the conclusion of the election.

(c) If charges are filed that allege violations of section 8(a)(1) and 8(a)(2) or section 8(b)(1)(A) of the Act and that challenge the circumstances surrounding the petition or the showing of interest submitted in support of the petition, or a charge is filed that alleges an employer has dominated a union in violation of section 8(a)(2) and seeks to disestablish a bargaining relationship, the regional director shall impound the ballots for up to 60 days from the conclusion of the election if the charge has not been withdrawn or dismissed prior to the conclusion of the election. If a complaint issues with respect to the charge at any point prior to expiration of that 60-day post-election period, then the ballots shall continue to be impounded until there is a final determination regarding the charge and its effect, if any, on the election petition. If the charge is withdrawn or dismissed at any time during that 60-day period, or if the 60-day period ends without a complaint issuing, then the ballots shall be promptly opened and counted. The 60-day period will not be extended, even if more than one unfair labor practice charge is filed serially.

(d) For all charges described in paragraphs (b) or (c) of this section, the certification of results (including, where appropriate, a certification of representative) shall not issue until there is a final disposition of the charge and a determination of its effect, if any, on the election petition.

promulgate the Rule. Consciously reinterpreting an employer's duty to bargain in good faith with the representative of a group of its employees—one of the core unfair labor practices defined by Congress in Section 8(a)(5) of the NLRA, 29 U.S.C. §158(a)(5)—is the epitome of a rule affecting unfair labor practices.

**V.      Section 10(f) is ambiguous as to whether it authorizes direct circuit-court review of Board rulemaking, and thus must be so construed under _Investment Company_, _NYRSC_, and _Lorion_.**

AFL-CIO also seeks (Opp. at 6-11, 15-19) to rebut the Board's broader contention that Section 10(f) encompasses _all_ Board rulemakings (i.e., that _AFL-CIO I_ was incorrectly decided). However, it does not dispute the overarching principle that, when construing a direct-review provision, the D.C. Circuit (and other courts) will read in favor of review except where there is very clear indication that the provision does not cover a particular class of cases. _Nat'l Auto. Dealers Ass'n_, 670 F.3d at 270. Instead, in agreement with _AFL-CIO I_, AFL-CIO merely argues that such clear indications are present here.

_A.  Text_

_AFL-CIO I_ finds indications that Section 10(f) applies only to unfair labor practice cases in Section 10(f)'s venue clause and its location within the statute. But it does so only by improperly conflating subject-matter jurisdiction with venue, an error AFL-CIO's opposition summarily repeats (Opp. at 15 n.3). Under Section 10(f), the venue for review is "any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in _or_ wherein [the aggrieved] person resides or transacts business, _or_ [the D.C. Circuit]." 29 U.S.C. § 160(f) (emphases added). This provision does not require there to have been an "unfair labor practice in question" to have effect. It _implies_ that there has been an "unfair labor practice in question," but that's the very definition of ambiguity—a statutory phrase that can be read in multiple different ways.

10

By the same token, both AFL-CIO here, and the court in *AFL-CIO I*, make much of the fact that Section 10(f) is placed within the section of the Act dealing with unfair labor practices. (Opp. at 10, 19, citing *AFL-CIO I*, at *10).[9] But we know why Congress structured the NLRA that way, and the reason has nothing to do with rulemaking. The overriding concern of Congress was to prohibit direct judicial review of representation cases. *AFL*, 308 U.S. at 401.[10] Under the pre-NLRA regime of judicial review, elections were not being held because orders to conduct such elections were stalled in the courts of appeals. *Id.* at 409 n.2. "The conclusion is unavoidable," the Supreme Court held, "that Congress, as the result of a deliberate choice of conflicting policies, has excluded representation certifications of the Board from the review by federal appellate courts authorized by the Wagner Act except in the circumstances specified in § 9(d)." *Id.* at 411.[11] So Congress separated the judicial review provision of unfair labor practices from the NLRA's provisions relating to representation certifications.

This history is all well known, but it tells us nothing about judicial review of *rulemaking*, a third, distinct statutory function of the Board that wasn't before the high Court in *AFL*. As the D.C. Circuit acknowledged in *NYRSC*, it's likely that Congress didn't even realize that it needed to provide a venue for rulemaking challenges—exactly as was the case for the SEC in the Investment Advisers Act, which was enacted in 1940, five years after the NLRA. At that time, the courts generally declined to engage in pre-enforcement review of agency rules because such

---

[9] As we previously noted (Mot. at 13 n.9), the caption itself is of no probative value here.

[10] *General Drivers, Chauffeurs & Helpers, Local 886, v. NLRB*, 179 F.2d 492, 494 (10th Cir. 1950), and *Inland Container Corp. v. NLRB*, 137 F.2d 642, 643 (6th Cir. 1943), cited by AFL-CIO, merely restate the principle of *AFL*.

[11] Section 9(d) provides that the record of a representation case "shall be included" with the record submitted to a court whenever a subsequent, related unfair labor practice order is challenged pursuant to the provisions of Section 10(f). 29 U.S.C. § 159(d). The "Wagner Act" mentioned by *AFL* is another name for the NLRA as originally enacted in 1935.

challenges were thought to be unripe. *NYRSC*, 799 F.3d at 1134. Thus, "drafters of review provisions [] were not typically considering those challenges." *Id*.[12] Congress made no "deliberate choice of conflicting policies," *AFL*, 308 U.S. at 411, when it came to subject-matter jurisdiction of rulemaking suits.

In some ways, the parties are not all that far apart here. If Section 10(f) were its own Section of the NLRA and did not offer the location of an unfair labor practice as one of several sources of appellate venue, we would likely not even be having this discussion—it would clearly apply to rulemakings. We agree with AFL-CIO that there are countervailing considerations, namely that Congress instead (i) included a venue provision that alludes to the existence of an unfair labor practice, and (ii) constructed it as a subsection of Section 10. Those countervailing considerations are what *makes* Section 10(f) ambiguous. But "plain meaning, like beauty, is sometimes in the eye of the beholder." *Lorion*, 470 U.S. at 737. Nothing in Section 10(f) resolves this ambiguity or expresses any clear Congressional intent to channel judicial review of Board rulemakings to district courts.

---

[12] As we previously explained (Mot. at 14), pre-enforcement challenges to rules were rare and widely assumed to be unripe in 1947, when Congress last amended the NLRA's rulemaking provision. This did not change until twenty years later, when the Supreme Court issued its landmark decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967). *See* Stephen G. Breyer & Richard B. Stewart, Administrative Law and Regulatory Policy 1110-11 (3d ed. 1992) ("Before *Abbott Laboratories*, the courts typically reviewed the lawfulness of an agency's rule, not when the agency promulgated the rule, but when the agency enforced the rule."); *accord PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2060 (2019) (four-Justice concurrence in the judgment) ("To be sure, this Court's decision in *Abbott Laboratories v. Gardner* revolutionized administrative law by also allowing facial, pre-enforcement challenges to agency orders, absent statutory preclusion of such pre-enforcement review." (citation omitted and emphasis removed)). Thus, it is likely that the 1947 Congress simply assumed that judicial review of Board rules would occur only, if at all, in the post-enforcement context—that is, when a person aggrieved by application of a rule in an unfair-labor-practice case challenged the rule in a court of appeals under Section 10(f).

### B.  Legislative History

If Section 10(f)'s ambiguous text fails clearly to resolve the question whether Congress committed rulemaking review to district or circuit courts, its legislative history is even less illuminating. We've already discussed the scant evidence available, which is that Congress clearly wanted to preclude judicial review of representation cases but had no clear intent of any kind as to rulemaking. We explained in our opening brief that the legislative history of the NLRA lacks any clear description of where judicial review of rulemakings is to be conducted. (Mot. at 14.) AFL-CIO evidently has not located any additional materials that shed light on the question presented, and neither have we.[13]

### C.  Caselaw

Moving next to AFL-CIO's review of caselaw under the NLRA (Opp. at 7-9, 17-19), when the Supreme Court said in *AFL* that the NLRA "on its face thus indicates a purpose to limit the review afforded by § 10 to orders of the Board prohibiting unfair labor practices," *id.* at 409, it was talking only about the exclusion of representation cases—not *sub silentio* deciding a question about the locus of judicial review of rulemakings in a case where no such question was ever presented. AFL-CIO resists the Board's characterization of the quoted language as dicta (Opp. at 7 n.1, 18 n.5), but the definition of a dictum is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." Black's Law Dictionary (11th ed. 2019).

---

[13] AFL-CIO does cite the legislative history of the Labor-Management Relations Act of 1947 to suggest "that Congress intended the Board's § 6 rulemaking authority to be subject solely to the prescriptions and principles of the APA." (Opp. at 4 (citing H.R. Conf. Rep., No. 510, 80th Cong. 1st Sess., p. 38 (1947)). All parties agree that the merits of this case turn upon whether the Board followed the APA's substantive standards. But the APA is not a jurisdictional grant. *Califano v. Sanders*, 430 U.S. 99, 107 (1977). Saying that it applies here cannot answer the question of which court is to perform the review of the merits in the first instance.

The Court did not need to (and in all likelihood did not intend to) comment on the locus of judicial review of *rulemaking* in order to decide that *individual representation certifications* are not final orders of the Board reviewable in court. *AFL*, 308 U.S. at 409. Rulemaking is not even mentioned in *AFL*. Nothing about the court's "rationale for holding that orders issued in representation cases are not subject to review under § 10(f)" (Opp. at 7 n.1) turned even to the slightest degree on its views about rulemaking. This is as classic an example of a "drive-by jurisdictional ruling . . . (if [it] can even be called a ruling on the point rather than a dictum)" as ever there was. *Steel Co.*, 523 U.S. at 91. Whether or not it technically constitutes a dictum, it has no precedential effect. *Id.*

The actual holding of *AFL* is that certifications in representation cases are not "final orders of the Board." *Id.* at 409. This means that they are not directly reviewable *anywhere*—not in circuit courts under NLRA Section 10(f), certainly, but also not in district courts under the Administrative Procedure Act (APA) either, since that Act allows review only of final agency action. 5 U.S.C. § 702; *see also id.* § 554(a)(6) (excluding from the APA's procedural requirements any adjudication involving "the certification of worker representatives"). Rulemakings are final agency action under the APA, while representation certifications are not, and so caselaw (which includes a number of the other cases cited by AFL-CIO (Opp. at 8-9), such as *General Drivers, Chauffeurs & Helpers, Local 886, v. NLRB*, 179 F.2d 492, 494 (10th Cir. 1950), and *Inland Container Corp. v. NLRB*, 137 F.2d 642, 643 (6th Cir. 1943)) interpreting Section 10(f) as prohibiting review of such certifications simply does not apply here.

AFL-CIO advances another line of cases to support its crabbed reading of Section 10(f), but those cases are even less on point. (Opp. at 7-8, citing *NLRB v. United Food & Commercial Workers, Local 23*, 484 U.S. 112, 127 (1987); *Laundry Workers Int'l Union Local 221 v. NLRB*,

197 F.2d 701 (5th Cir. 1952); *Lincourt v. NLRB*, 170 F.2d 306, 307 (1st Cir. 1948).) They involve dismissals or prehearing settlements of unfair labor practice charges, or the conduct of investigations, by the NLRB's General Counsel. But "the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint." *Vaca v. Sipes*, 386 U.S. 171, 182 (1967); *cf. UFCW, Local 23*, 484 U.S. at 130-33 (citing 5 U.S.C. § 701(a)) (APA does not allow for judicial review of pre-hearing decisions to settle or decline prosecution of unfair labor practice cases because such review is precluded by the NLRA). Since no court may review the General Counsel's exercise of prosecutorial discretion, transferring such challenges to a different court to effectuate the inevitable dismissal would be a pointless exercise. *See* 28 U.S.C. § 1631 (transfers to cure want of jurisdiction appropriate only "if it is in the interest of justice").

AFL-CIO also cites to a handful of additional types of cases that have been held to fall outside of Section 10(f), all of which are either distinguishable, demonstrably incorrect, or both. The first of these (Opp. at 8), orders quashing hearings in "jurisdictional dispute" cases governed by NLRA Section 10(k), 29 U.S.C. § 160(k), actually implicates a contentious—albeit narrow— circuit split. The *en banc* Ninth Circuit has held that such orders are subject to direct judicial review. *See Foley-Wismer & Becker v. NLRB*, 682 F.2d 770 (9th Cir. 1982), *supplemented*, 695 F.2d 424 (9th Cir. 1982). Other circuits disagree. *Shell Chem. Co. v. NLRB*, 495 F.2d 1116 (5th Cir. 1974); *Manhattan Constr. Co. v. NLRB*, 198 F.2d 320 (10th Cir. 1952). As the majority and dissenting opinions in *Foley-Wismer* make clear, however, the dispute is over whether such orders are in fact "final agency action" and therefore reviewable in circuit courts, or not final and not reviewable at all. No court has ever endorsed the position, analogous to the one AFL-CIO advances here, that they are reviewable in district courts.

It next cites to "administrative discipline" cases in which the Board reprimands, suspends, or disbars a practitioner from appearing before it under 29 C.F.R. § 102.177. (Opp. at 9.) Those cases are distinguishable—unlike rulemaking, a statutory function of the Board under Section 6 of the Act, administrative discipline is a nonstatutory housekeeping matter. In any event, the D.C. Circuit's resolution of *Keiler v. NLRB*, No. 95-1192, 1996 WL 103746 (D.C. Cir. 1996), is not only not precedential, it is not even citable as persuasive authority under the D.C. Circuit's local rules. D.C. Cir. R. 32.1(b)(1)(A) (unpublished dispositions "entered before January 1, 2002, are not to be cited as precedent").[14]

Finally, *New York Racing Ass'n v. NLRB*, 708 F.2d 46, 54 (2d Cir. 1983), also cited by AFL-CIO (Opp. at 9), summarily held that district courts have jurisdiction to review the procedures by which the Board determines to decline jurisdiction over particular industries, but not the substance of those determinations. That case does not bind this court and offers no explanation for its creation of a regime of bifurcated judicial review. It may have had some heft when it issued—*but see Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 389 (4th Cir. 2010) (cases that "offer no rationale for their holdings" are unpersuasive). But just two years later, the Supreme Court in *Lorion* instructed courts not to adopt interpretations of direct-review provisions that would create a "seemingly irrational bifurcated system" of review unless the statute in question simply cannot be read to vest all judicial review in a single level of the courts. 470 U.S. at 742 (quoting *Crown Simpson Pulp Co. v. Castle*, 445 U. S. 193, 196-197 (1980)). We doubt *New York Racing*'s residual precedential weight even within the Second Circuit, and of course it has none here.

---

[14] As we previously warned AFL-CIO's attorneys about this rule in *AFL-CIO I*, we request here that the citation be stricken from the briefs.

*D.  The NLRA in its broader context*

At the end of the day, there is simply nothing in either case law or legislative history that could provide any indication—much less the requisite "firm indication"—that Congress wanted NLRA rulemakings reviewed by district courts. This is not surprising, because such a desire would completely contradict what we know about Congressional intent in enacting the NLRA. Unfair labor practice orders skip over district courts completely; the only involvement of district courts in the NLRA scheme is as to ancillary matters of subpoena enforcement and pendent relief that require swift action; and the 1935 Congress repeatedly expressed opposition to the then-prevalent practice of district courts interjecting themselves into labor-policy questions by enjoining elections before employees could even express their sentiments on unionization. *See, e.g.*, S. Rep. No. 74-573, reprinted at 2 *Legislative History of the National Labor Relations Act* 2300, 2305 (1949). At an even more general level, the passage of the Railway Labor Act, Norris-LaGuardia Act, and National Labor Relations Act between 1926 and 1935, represented a conscious break from the prior era of "government by injunction," in which federal district judges exercised what amounted to democratically-unaccountable control of national labor policy. *See generally* William Forbath, *The Shaping of the American Labor Movement*, 102 HARV. L. REV. 1180-85, 1227-35 (1989). The idea that the same Congress would have returned to those same district judges the power to issue sweeping injunctions against the Board's efforts to govern that same labor policy through the enactment of rules and regulations defies explanation.

Consider, for example, the Board's recently announced rule modifying the standard for determining whether two employers are a joint employer under the NLRA. *See Joint Employer Status Under the National Labor Relations Act*, 85 Fed. Reg. 11,184 (Feb. 26, 2020). Previously,

the Board had changed that standard in an unfair-labor-practice case, which was reviewed by the D.C. Circuit in the first instance under Section 10(f). *Browning-Ferris Indus. of Cal., Inc.*, 362 NLRB 1599 (2015), *aff'd in part, rev'd in part and remanded*, 911 F.3d 1195 (D.C. Cir. 2018); *see generally NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("The Board is not precluded from announcing new principles in an adjudicative proceeding and . . . the choice between rulemaking and adjudication lies in the first instance within the Board's discretion."). Yet, AFL-CIO's position would cause the current rule to be reviewed in district court. The dichotomy is baffling. There is no reason to suspect that Congress wanted circuit courts to exercise initial review of the Board's "new principles" when they are announced via adjudication but not when the Board chooses to act via rulemaking.

Even aside from these NLRA-specific considerations, of course, there are all sorts of problems with routing judicial review of Board rulemakings to district courts—an approach that ultimately benefits no one. Under such a scheme, the district courts are taxed with deciding cases under a statute that they rarely interpret and subject to *de novo* circuit court review anyway. This wastes district judges' time, the Board's resources, and private challengers' money on what amounts to a dress rehearsal. *Cf. Lorion*, 470 U.S. at 744 (describing the "waste" attendant in "duplication of the identical task" of reviewing an administrative record first in district, and then in circuit courts).

*Lorion*'s discussion warrants additional analysis because it is particularly instructive here. That case involved a citizen request for a hearing on suspending a nuclear plant's operating license, which was denied (following an extensive discussion and citation of evidence) by the Nuclear Regulatory Commission. *Id.* at 731. The applicable direct-review provision provided for circuit court review of orders in a "proceeding for the granting, suspending, revoking, or

amending of any license" by the NRC, but the court of appeals reasoned that since the NRC had

not actually initiated such a proceeding and the petitioner had no right to have such a proceeding

initiated, the matter fell outside of its jurisdiction. *Id.* at 733. The Supreme Court reversed,

finding that the statute, while it could be read to foreclose appellate jurisdiction in cases decided

without a hearing, could also be read to create such jurisdiction independent of whether a hearing

had taken place or not. *Id.* at 736. The Court found "fragmentary" evidence in the legislative

record suggesting that Congress would have preferred the result it reached, but it also relied upon

the more fundamental observation that the statute reflected a "basic congressional choice" to

"avoid the duplication of effort involved in creation of a separate record before the agency and

before the district court." *Id.* at 740. It also noted several bizarre consequences that would follow

from the court of appeals' holding which, while not precisely identical to those we've just

identified under the NLRA, involve similar inefficiencies of time and effort. *Id.* at 742-43 (citing

*Investment Company*, 551 F.2d at 1276). Finally, the Court articulated a number of general

problems with district-court review of administrative action, notably the absence of any role for

the court's factfinding function—since, if the administrative record is inadequate, the appropriate

course is to remand the case, not redecide it on the basis of proceedings in district court. *Id.* at

744.

 It was this constellation of considerations that led the Court to pronounce that "[a]bsent a

firm indication that Congress intended to locate initial APA review of agency action in the

district courts, we will not presume that Congress intended to depart from the sound policy of

placing initial APA review in the courts of appeals." *Id.* at 745. We have a system of district

courts, in the first instance, to find facts and apply the law to those facts in cases which require

those functions, not to add an additional layer of cold-record review to cases that will already

receive it at the appellate level. Two-layer review also needlessly delays the final resolution of those very challenges. It was, of course, for exactly these reasons that the D.C. Circuit created the *Investment Company* presumption—that where Congress has certainly committed "orders" to direct circuit-court review, courts should avoid, wherever possible, reading those review provisions to require district courts to review rulemakings.

AFL-CIO's answer to this problem is simply to shrug; it does not even attempt to explain why it believes Congress committed NLRB rulemaking to district courts. But such a blinkered approach runs squarely afoul of the D.C. Circuit's instructions to broadly interpret New Deal-era direct-review provisions to give full effect to Congressional intent in enacting those provisions. *NYRSC*, 799 F.3d at 1134.

The Board's motion should be granted and this matter transferred to the United States Court of Appeals for the D.C. Circuit.

Respectfully submitted,

Dated: September 11, 2020

WILLIAM G. MASCIOLI
*Assistant General Counsel*

DAWN L. GOLDSTEIN
*Deputy Assistant General Counsel*

POLLY MISRA
*Supervisory Attorney*

/s/Paul A. Thomas
PAUL A. THOMAS
*Trial Attorney*
National Labor Relations Board
Contempt, Compliance and Special Litigation Branch
paul.thomas@nlrb.gov
(202) 273-3788
1015 Half St. SE
Washington, DC 20003

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that the attached document was filed on September 11, 2020, and served upon counsel of record for all parties via the court's CM/ECF system.

<u>/s/ Paul A. Thomas</u>